Madam Clerk, please call the next case. 214-1210, Mary Matson v. City of Waukegan Counsel, you may proceed. Good morning, Your Honors. May it please the Court, my name is Krisha Ressler, Bernard Wysocki, Counsel. I represent the employer, the City of Waukegan, in this matter. The issue is whether the Workers' Compensation's decision was correct in finding that no causal connection between October 27, 2005 work injury and its 2007 condition. We would hold that the Commission's finding is not against the manifest way to the evidence and it should be affirmed. The Commission based its decision on a number of factors and facts and based it on confident, credible evidence to support its decision. The first thing, as we all know, that was undisputed is that Matson had back pain for over 20 years when he worked for the City of Waukegan. On October 27, 2005, Matson was on duty working and he stepped in a depression in the ground while working in the field and jammed his back. Mr. Matson's actions in this case speak louder than words. What I mean by that is when Mr. Matson got hurt, he testified that he was sweating, breathing heavy, never felt this type of sensation in his back ever in his lifetime when he stepped in this 4-inch depression and jammed his back. But yet, he took 11 days to seek medical attention. The City doesn't dispute that this is an injury, we just state that this is a minor injury. What is also interesting is when he took the, after 11 days when he went to the medical doctor, he didn't go to his regular doctor, which is interesting since in the past 20 years, he has repeatedly gone to Libertyville Medical Group after any type of back pain, but this time he went to Vista Health where he was diagnosed with a lumbar strain. It was not until 25 days later that he was examined by Dr. Jalobin. And at that time, Dr. Jalobin stated that it's just a keep with the physical therapy and he doesn't even recommend the epidural cortisone injection. Mr. Matson continued to do physical therapy and then in December of 2005, he was discharged by Dr. Jalobin and also discharged from the physical therapy at that point. And the physical therapist said that he had met all of his goals. Now, up until that point, the City has paid everything and is not in dispute. What is in dispute is that after December 19th of 2005 back track, Dr. Jalobin stated that he would like him to see, he would like to see Mr. Matson in five weeks to be re-evaluated. Coming to the case, I mean, the issue is whether there's sufficient evidence in the record to support the decision of the commission. That's who we review. The commission relied on Jalobin, correct? Box Jalobin. Correct. All right. For some reason, the trial judge didn't like Levin? Thought he was, didn't like his, it was something missing from his analysis or something? Right, and that, and that is the crux of the, that we see as a red herring. Because the whole plaintiff's brief is all about whether or not Dr. Mark Levin has seen this 1998 MRI film. Well, nowhere has there been any discussion of Dr. Mark Levin testifying. It's not the same Mark Levin that's on radio where we can't hear him. Oh, I'm not sure. But Mark Levin was being deposed and the, at the deposition, he was handed this 1998 MRI report. And he was asked to look at the MRI report and to distinguish whether it matched the 2005 to the 2007. And he was discussing how he thought that this 1998 MRI report is very similar to the 2005 MRI report that was taken by his brother, Dr. Jalobin. And it, both were distinguishable to the 2007 MRI report. So I don't know where this whole, why it's important that we have the 1998 MRI film or report comparable, since Dr. Mark Levin already made his opinion that the 2005 MRI report is. Well, let me just ask you another question. Yeah. Does the trial judge get to re-weigh the medical evidence and trial judge resolve the conflicts in the medical evidence? Or is that up to the commission to do? It's up to the commission. The argument is relatively simple, right? Right. There was conflicting medical opinions in this case. The commission resolved them in favor of the employer. And that should be it, right? It should be. All right. Well, on the view, aren't we supposed to look a little bit at foundation? Well, yeah. To whether or not the opinion is sufficiently grounded or founded. Well, that's, and that's our point, is that the, when the circuit court looked at it, it just based it all on Dr. Levin. And I understand that most of the commission's decision was based on Dr. Mark Levin's opinion. But there was also a numerous amount of evidence, even from Dr. Schell, Mr. Madsen's back orthopedic surgeon, that was the same as Dr. Mark Levin's opinion. For example, they both agreed that Mr. Madsen had no conservative treatment for a year and a half. They both, in Dr. Schell's opinion, or testimony, and Dr. Levin, they both saw that Mr. Madsen going to his primary physician, the Libertyville Medical Group, for a, once in February of 2006, and once in November of 2006, both were not considered conservative treatment on the back. Well, let me ask you this. We can parse this out. But, I mean, the point being, certainly an opinion has to have a legitimate foundational basis. And that seems to be an issue here. Trial judge didn't think it was there. Commission did. So the next question is, is there any other corroboration or support for Levin's opinion? Who is Ms. Grapnik? She was asked by Mr. Madsen to testify whether there was the, oh, the physical therapist. I apologize. Is it true she diagnosed a claimant with a lumbar strain, felt he was able to return to full-duty work in December 2005, and continue working until July 2nd, 2007? So I guess what I'm saying is that does she support Levin's opinion that the claimant suffered from a lumbar strain that resolved itself? Isn't that what she? Correct. So it doesn't just rest totally on Levin's opinion, does it? No. It also rests on the physical therapist. You went back to work full-duty December 2005, and then from January 2006 until I guess it was July 2007, he worked full-duty and had no medical treatment. Is that right? No medical treatment and no medical restrictions, which that's our argument as well, is that this was a minor injury. I mean, he worked for, he did workers' compensation for the city of Waukegan. So he had an out, Dr. Jay Levin said, come back and see me in five weeks. He never came back. So he never kept the causal connection. There was no connection. After he stopped seeing Jay Levin, it's considered a minor injury to us because there's nothing connecting anything, especially when everyone sees that even Dr. Schall states that there was something that occurred probably between the November of 2005 MRI and the 2007. They both testified that there was a herniated disc that was developed during that time, which, you know, he was hurt in October. So from our standpoint, he was already. So the first MRI was after his claimed injury. Right. And it didn't show a herniated disc. No. It was the 2007 MRI that did show a herniated disc. Right. And his testimony and showing of medical evidence, he all of a sudden started treating with a chiropractor in June of 2007 and then went to see Dr. Bert Schall. And even in the Dr. Bert Schall's medical first written report says that his back has been bothering him for the last couple of weeks. So based on that, we would ask for you to confirm, affirm the commissions and reverse the circuit court. Thank you, Counsel. Thank you. Counsel, you may call. May it please the Court, my name is Mark Jeep from Waukegan. Good morning, Counsel. Unquestionably, the case, the linchpin of the case, both for the terms of the commission's decision and the analysis of the case, is the opinion on causal relationship rendered by Dr. Mark Levin, Section 12 examiner and respondents. Dr. Levin was a retained expert. Judge Stark observed in our argument that Mark Levin never saw the 1998 MRI film that he said he saw when he compared the 98 films and the old five films and said they're markedly similar, there's not much difference, and not much happened in the incident that occurred on October 27th. I'm sorry. And I'm sorry for interrupting. Where did Dr. Mark Levin say that he saw the film? Was this during his deposition? In his deposition. And it was very clear what we were arguing about in the deposition. I mean this with the utmost respect, but respondent changed lawyers halfway through the race here. And Mr. Wysocki and Ms. Ressler were not in the room. Mr. Ulrich and I, Bob Ulrich with whom I'm sure you're familiar, Bob was defending the case for the city at that time. Now, an interesting development. Okay, let me ask a question about that deposition. I mean, isn't it pretty clear in the deposition he testified he had not seen the 1998 MRI report until just before the deposition? That's correct. He testified to the report while holding it in his hand in the deposition. That's true. He never claimed that he had seen the films. He said he hadn't even seen the report until the day of the deposition. Judge, I think the transcript is pretty clear that he did in fact see the film. You're saying he said he saw the film, and I think that's a very important point. You're saying this isn't even subject to interpretation. I think the transcript is clear because he made it clear he saw the 2005-2007. My recollection is he saw the 2005. There's three of them. 2005. I think he said he saw the 2005 film. Okay. I'm not even sure the 2007 MRI was even available for him to look at yet. But it's clear he looked at the 2005, and I think it's clear in the transcript he said he looked at the 1998 film. That deposition only got repeated at that point. I'll be honest with you. Somebody asked, does Judge Stark like Dr. Levin? That's kind of besides the point. Did we ask that? Did somebody ask that? I thought you did. Whether he does or not is besides the point. It got kind of heated between he and I, and that's why we took that break. Go get me the 1998 film and let's look at it because he said he had seen it, and I knew perfectly well sitting there he couldn't have because my client had the only copy of it, and he had given it to Dr. Shell, the only person he'd ever taken it to, and there's credible testimony on that which arbitrator Urbache believed. And we brought in the keeper of the records later on at the hearing to say, this MRI film was only given to Manson, nobody else, and it's been purged out of our records and unavailable for anybody else to look at. So I knew when I sent him out of the room, I was calling his bluff, and if so, I will concede there's a break. After the break, yes, there was a break. It happened after the break. No, it did. In the deposition. Yes. Tell us what happened after the break. I'm sorry, I'm sorry. Tell us what happened in the break after the deposition. In the deposition. My bad ear was siren. I'm sorry. I lost that. He came back after a break. There was some awkward, we sent those films back. We had those films, but we sent them back. They're no longer in our film records. That's my recollection of what occurred after the break. Now, an interesting thing has happened. In briefs to this court, respondent has now taken the position that Dr. Levin, Dr. Mark Levin, never saw the 98 film. They never made the film-to-film comparison. He never said that he did that. Yet that is the linchpin of their case until they got here. They realized the problem which has been created when Judge Stark says, your expert just collapsed. He said, that just happened. Experts collapse on you. His opinions are based on a foundation of sin. His bases have collapsed on you. And you no longer have a causal relationship opinion. And the only guy left standing is Dr. Schell's causal relationship. Was it already before the commission, the arbitrator, that the- They never. I'm sorry, perhaps I'm anticipating. There was a flaw in the underlying opinion. Was that argued? I argued the heck out of it, which is why I brought in Maria Kouroulis to testify and keep her records. It's why I asked the questions I asked at the deposition, to expose this fact that he did not make a film-to-film comparison and could not have. Yet the commission didn't pick up on this exposure. They didn't. Judge Herbace did. Arbitrator Herbace did. What difference does it make whether he saw the magnitude? We could say, and I figure, what should we ask? But is there plenty of other information in this? Is there any requirement to sustain this? I can go point by point and pick at some of the points that Ms. Ressler made, but I think the thing to note here is that this was the linchpin of the commission's decision because they referred to the film-to-film comparison not once, not twice, but three times. They mentioned it twice in their findings, and specifically the commission decision at page 6, the middle of the page. He then reviewed the MRI from July 1698, which he stated agreed perfectly with his opinion, etc., and then in their findings on the next page. Moral of the MRI of July 98, when compared to the MRI of November 17, 2005, is very similar. It would have been noted that both MRIs show an annular tear. The very next paragraph, again. Why can't that be interpreted as they're saying he, excuse me, the report as opposed to the film? They said he reviewed the MRI. We're in the business of parsing words. That's what we do in Florida. We allow commissions decisions that are not rule-specific. My wife has criticized me for not being too terribly precise. Let me point out what they didn't say. They didn't say MRI report. They said film. They didn't say the impressions of the radiologist. In the commission's decision, does it say film or does it say film? Well, okay. He reviewed the MRI. The MRIs of July 98 and November 05 confirm no changes. The MRI of July compared to the MRI of November. And in the deposition, he was handed the report. I agree with that. And he testified to a comparison of the 1998 MRI as reported and the 2005 MRI. I think. I mean, he did that, didn't he? He did. That's absolutely true. I think the clear inference from the opinion or the decision of the commission is that the takeaway from this is that Dr. Levin did a film-to-film comparison. Because they didn't say MRI report. They didn't say the radiologist's impression. They said the MRI of this date and that date when compared. That was very important to the commission. There's other things I can quarrel about, but that seems to have been the linchpin of the commission's decision. Did Dr. Levin write a report? He did. Did he ever state in that report that he saw the 1998 film? He did not say that. Didn't he say that he compared the 2005 film and the 2007 film? He said he saw the 05 film. I don't believe Dr. Levin, frankly, was aware there was a 98 film until I put the report in his hand. But he came to his conclusions or his opinions in a report that made no reference to the 98 film. Well, again, Justice Hoffman, with all respect, he told us that his deposition and basis of his reports and his opinions were a complete review of the man's medical records. Clearly, he didn't know about a 98 MRI. In fact, he told us in his deposition for the first time he was never given the extensive records of his primary care physician, Dr. Dean Karamichos, from Libertyville Medical Group. He went back 20 years and revealed something he had known all along. He fell 20 years earlier putting up Christmas lights up 20 feet and had back pain for a while. Dr. Levin had no idea that the last time he was treated for back pain was in 1998. He'd gone seven years without any complaints of back pain in the primary care physician record. And he goes to the doctor frequently. The gentleman suffers from malignant melanomas, has had two major surgeries. He has elevated cholesterol, some hypertension issues. He gets to the doctor once or twice a year. No treatment for back pain from 1998 until October of 2005. Mentioned in the family doctor's records or anywhere else. The point, though, Justice Hoffman, is that Mark Levin, I keep pausing because Jay and Mark are brothers, Mark Levin didn't know when preparing his report to the point you were making. So I respectfully submit that not only the linchpin of the respondent's case, but the linchpin of the commission's decision is this idea of how significant was the injury that occurred when this guy stepped in a hole and jumped his back. One way to tell is to look at these comparative MRIs. The commission thinks, I respectfully submit, Justice, that he did a film to film. He did not. I proved he did not. And now they concede in their brief that he did not do that. They didn't concede that earlier. At the commission level, that was not conceded. Now, a couple of things I want to say about that. First, I'm not sure you can make a new argument at this level of appeal, but it's a fact argument. I'm not sure how the court would treat that. I think if you make it here for the first time, it's deemed way. Secondly, Bob Ulrich never made that argument. Bob Ulrich never made that argument in his statement of exceptions. He didn't make it, he couldn't make it, and he wouldn't have made it because he knew what happened in that deposition. And thirdly, frankly, with that concession that Mark Levin never looked and did a comparison film to film, 98 to 2005, I think the game's over. I think that's checkmate. They conceded that it did not occur. And again, Justice, I think the fair takeaway from this is that the commission thought he did when they made their decision. Having said that, I'm going to point the point about some of these other points that Ms. Reznor talked about. I don't want to bore you too much. But did he return to full duty? His full duty was cemetery work. He did go to full duty. He also was a snow plow. He was on what's called the extra duty roster, and he did snow plowing. That winter, he took himself off the extra duty list and never returned to snow plowing. They're big trucks, and it jars his back, and he said he couldn't do it anymore due to back pain. He'd done it every year up to that time and did it for DOT when he worked for the state law. That's corroborated by the supervisor, the co-employer, supervisor, who runs the extra duty list who brought him in to testify. He said, this guy's got back pain. He couldn't do the snow plowing anymore. It was corroborated by the guy who was also the supervisor but more a friend, co-level employee. They played cricket together. I brought him in. He said, this guy, I've been watching him for the last two years. He's getting cocked over on your walks. He can't sit. I'm observing a deteriorating back condition on this co-employee. So the idea that he returned to work full duty without any back problems and everything was hunky-dory on December the 19th, 2005, it really ignores these facts. Secondly, objective evidence as to how hunky-dory his back was. When he left Ms. Ressler, he says he met most or all, met many or all of the objectives of physical therapy. But that last trip to the physical therapist, which was December the 16th, 2005, he reports four out of ten pain when sitting, going to five, six out of ten pain with any activity. Limitations on all planes of direction and range of motion, and tenderness to help patients with low heart spine. That's the last physical therapy. He never went back to Dr. J. Levin. J. Levin said, come back and see me in five or six weeks. I want you to finish your PT. Five or six weeks, actually, seven weeks later, he went to see his primary care physician. Chief complaint back then, he got bifurcated. That was February 6th, 2006. He returned in July to get a, I'm sorry, called in in July to get a refill of bifurcated in Mobic. In November, he got a six-month supply of bifurcated in Mobic. In November, he saw the doctor again, Dr. Carmichael's primary care physician, and reported, he was there for a physical, undergradiated disc, back pain, refill of bifurcated. Then he goes to see Dr. Schell the following summer. Another MRI is done. The disc has progressed. What started as an annular tear has now progressed to an extruded disc, and he very promptly gets a two-level discectomy and fusion. So to speak to the point that everything was hunky-dory and there was no medical care, the record belies that. Those aren't the facts. So is there other stuff in the record that could support the commission's decision? And I think that's really the burden I have to speak to. I have tried to speak to it on a point-by-point, but honestly the commission gets to make the final call on those things. I get it. But the key thing is the MRIs. That's the linchpin of this decision. It collapsed, and I think Judge Stark was absolutely right to say the last man standing in medical causation is Bert Schell. Thank you, counsel.  Thank you, Your Honor. Not to beat a dead horse, but it is true, we were not party to the game at the time of the deposition of Dr. Mark Levin. So we are reading it as you are all reading it, and in our reading of the transcripts there was no mention of this 1998 film when he was going back and forth from the office to find this film. Our interpretation of this was he was talking about the 2005. Now, this deposition was taken almost two years after he wrote this medical report. So he already put in his two reports that he looked at the 2005, and then his next medical report he stated that he reviewed the 2005 and 2007. I don't understand what he would benefit from after just being handed the medical report from both the attorneys saying, I've never seen this before. And then, you know, pages later testifying, yeah, I've seen all the films, even though he hasn't ever written it in his reports. We all know that these doctors basically go from what is written on their medical reports when they're testifying to recall their recollection, and that 1998 MRI was never in that medical report. So we believe that, you know, he never did see this MRI film. And further, just to note about the whole snow plowing issue, is he never had any restrictions when he returned back to work in December of 2005. He took the snow plowing off for himself. And basically from there to 2007, even with the 50-pound restriction that Dr. Schell gave, there was never, no ever snow plowing restrictions. And with that, we would ask you to affirm the commission's decision. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter. We'll be taking it under advisement, written disposition shall issue.